IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL ACTION NO. 17-00051-KD-N |
| | ) |
| EDDIE JAMES GRANT | ) |
|     Defendant | ) |

**ORDER**

This matter is before the Court on Defendant's Motion to Suppress, the United States' response, the Defendant's reply, and the parties' additional briefing. (Docs. 25, 28, 31, 35, 39, 40). Upon consideration and following a suppression hearing, the motion to suppress (Doc. 25) is **DENIED**.

    **I.**    **Facts**

On March 3, 2017, officers of the Mobile Police Department executed a search warrant for "the premises and curtilage" located at Apartment 86 of Serenity Apartments in Mobile, Alabama. (Doc. 25-1). Officers seized "a small amount of marijuana along with a Smith & Wesson .40 caliber pistol." (Doc. 28 at 1). On March 30, 2017, the Defendant was indicted for violating 18 U.S.C § 922(g)(1), based on the gun found as a result of the search. (Doc. 1). The Defendant has moved to suppress this evidence, arguing that his Fourth Amendment rights were violated.

    **A.**    **The Apartment**

At the suppression hearing, Mobile Police Department certified K-9 handler Corporal Christopher Giattina ("Giattina") testified about Apartment 86 and its surroundings. Serenity Apartments is an apartment complex containing several apartment buildings. Apartment 86 is on the second floor of one of these buildings and its front door opens onto a breezeway that contains

four front doors to four separate apartments. There is one apartment next to Apartment 86 and two apartments across the breezeway. Photographs admitted into evidence at the suppression hearing confirm these descriptions. A resident or guest of any of these apartments may park in the parking lot, ascend the stairs, and access the breezeway and the apartments without encountering any locked doors or gates along the way.

> B.   The Investigation

According to Mobile Police Officer Kenyada Taylor's ("Taylor") affidavit in support of the issuance of the search warrant, she had "received information from a reliable source that [the Defendant] possesse[d] a large amount of marijuana inside [Apartment 86]. (Doc. 25-1). The affidavit also stated that a "[reliable source] advised [Taylor] that [the Defendant] sells marijuana throughout the [C]ity of [M]obile operating a red Mazda which belongs to his girlfriend." *Id*. At Taylor's request, a few days[1] before the issuance of the search warrant, Giattina and his drug detecting dog, Aron went to the apartment complex to assist with the investigation.

> C.   The Dog Sniff

Upon arrival at the apartment complex, Giattina and Aron went up the stairs to the second floor breezeway onto which Apartment 86 opened. Once at the top of the stairway, Giattina testified that he "scanned" Aron, meaning that he gave Aron a command to begin the process of attempting to locate the smell of narcotics.

Giattina testified that he always begins a search such as this in a clockwise manner in order to be sure nothing is missed. Viewing the breezeway from the top of the one flight stairway leading up to it, Aron commenced his assignment at the apartment door that was the first to his left, then continued to the apartment to its right. Aron and Giattina then crossed the breezeway to Apartment 86, where Aron alerted to the presence of narcotics by sitting down and staring at the

---

[1] The record is unclear the exact date of Giattina and Aron's visit to the breezeway outside Apartment 86.

door. Aron completed his "scan" by smelling the fourth apartment on the breezeway. Giattina testified that Aron smelled at the seams of the four apartment doors, getting as close as he could to the inside of the building without entering any of the apartments. He alerted only on Apartment 86.

In what Giattina referred to as "proofing" or "double checking," he instructed Aron to repeat the scan from the same starting point and in the same order as he has scanned the first time. Again, Aron alerted on Apartment 86 by sitting and staring at the door. Giattina went downstairs, and informed Taylor of Aron's alerts. Taylor included Giattina and Aron's findings in her affidavit submitted in support of the search warrant for Apartment 86. Taylor's affidavit also stated that during the Aron's sniff, she "observed a [r]ed Mazda parked in front of the building bearing tag # 2BG3919 registered to Kaelyn Williams who is [the Defendant's] girlfriend." (Doc. 25-1). On February 22, 2017, a Mobile County Circuit Judge signed a search warrant for Apartment 86. The warrant was executed March 3, 2017. (Doc. 28 at 1). The firearm discovered during the search is the basis of the § 922(g)(1) charge now pending against the Defendant.

**II.     Analysis**

Defendant's motion to suppress is based on the United States Supreme Court's 2013 *Florida v. Jardines* decision. 133 S. Ct. 1409 (2013). In *Jardines*, the Supreme Court held that the use of a drug detecting dog on a homeowner's porch to investigate the presence of drugs in the home is a search that requires a warrant. *Id*. In *Jardines*, the warrant was not obtained until after the dog sniffed out the drugs. *Id*. at 1413. The area in question in *Jardines* was the front porch of a house, whereas here, the area is the area outside an apartment within an apartment complex. The Supreme Court held that the initial inquiry in a situation such as this, is one based in property law. The first question is whether the area searched is a "constitutionally protected

3

area." *Id*. at 1414-15. If so, the second question is whether law enforcement engaged in an "unlicensed physical intrusion" into that area. *Jardines* at 1415. ("Since the officers' investigation took place in a constitutionally protected area, we turn to the question of whether it was accomplished through an unlicensed physical intrusion."). After finding that there had been an unlicensed physical intrusion into a constitutionally protected area the Supreme Court clarified:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

*Jardines* at 1417. The *Jardines* Court also explained:

> The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States v. Jones,* 565 U.S. ——, ——, n. 3, 132 S.Ct. 945, 950–951, n. 3, 181 L.Ed.2d 911 (2012). By reason of our decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), property rights "are not the sole measure of Fourth Amendment violations," *Soldal v. Cook County,* 506 U.S. 56, 64, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992)—but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government *does* engage in [a] physical intrusion of a constitutionally protected area," *United States v. Knotts,* 460 U.S. 276, 286, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (Brennan, J., concurring in the judgment).

*Jardines* at 1414.

Under *Jardines*, the first inquiry is whether a Fourth Amendment search has occurred in a constitutionally protected area. Here, the area just outside of Apartment 86 (*i.e.* the seam of the door and area immediately outside the door of the apartment) was part of the apartment's

4

curtilage. Though the apartment opened onto a breezeway, which may be subjected to a lessened expectation of privacy, the search being contested occurred at the door Apartment 86.

In *Young v. Borders*, though decided in the context of a 42 U.S.C. § 1983 action, the Eleventh Circuit explained:

> …Deputy Sylvester **stood on the ground immediately surrounding the stoop** to Apartment 114 as he knocked on the front door. Under a Fourth Amendment analysis, Sylvester entered the curtilage of Mr. Scott's home without a warrant, and his **conduct at the door** took place in a constitutionally protected area. Jardines, 569 U.S. at ——, 133 S.Ct. at 1415 (instructing that the area "surrounding and associated with the home"—the curtilage—is "part of the home itself for Fourth Amendment purposes" and that a "front porch is the classic exemplar of an area ... to which the activity of home life extends").

850 F.3d 1274 (11th Cir. 2017)(emphasis added). Here, the dog sniffed "at the seam" of the apartment door. Thus, he was "at the door" and that area was "constitutionally protected," as described in *Young*. Though mindful of the *Dunn*[2] factors, and the differences between the apartments in *Young*[3] and this case, the Court sees no difference between the police officer's

---

[2] In *United States v. Taylor,* the Eleventh Circuit summarized curtilage, including the Supreme Court's *Dunn* decision as follows:

> The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life,' ... and therefore has been considered part of the home itself for Fourth Amendment purposes." *Id.* (internal citation omitted). The Court reaffirmed this position in *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), stating that "[in *Oliver*] we recognized that the Fourth Amendment protects the curtilage of a house." But the Court recognized that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* Thus, although the private property immediately adjacent to a home is treated as the home itself, this area is not unlimited. It is limited to that property that the individual should reasonably expect to be treated as the home itself. *Id.*...The Court in *Dunn* identified four factors that assist us in resolving this question: (1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation. 480 U.S. at 301, 107 S.Ct. 1134; *accord United States v. Hall,* 47 F.3d 1091, 1096 (11th Cir.1995).

458 F.3d 1201, 1206 (11th Cir. 2006).

[3] As described in the United States' response, the *Young* apartment did not open onto a breezeway like Apartment 86 does, and may be more similar to the front porch described in *Jardines*. (Doc. 35 at 4-5). The Court withholds ruling

location as described in *Young*, and the dog's location when he smelled at the seam of Apartment 86's door, as both were "at the door." In *Jardines*, the dog also sniffed at "the base of the front door." *Jardines* at 1413.

As the dog sniff occurred in a constitutionally protected area, the next question is whether there was an "unlicensed physical intrusion." *Jardines* at 1415. Per *Jardines*, there certainly was. *Jardines* at 1416 ("But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*.")(emphasis in original).

However, in this case the issue is more complicated because there is no evidence that Defendant has any property interest in the house. The parties do not dispute that the Defendant was an overnight guest at Apartment 86. The Court has long recognized that overnight guests in the homes of a third person may have a reasonable expectation of privacy in those premises. *Minnesota v. Olson,* 495 U.S. 91 (1990). However, in *Jardines*, it was the homeowner, not an invited guest, who moved to suppress evidence, and the Court found that the dog sniff in the curtilage of the home was a trespassory violation of the Fourth Amendment. And a trespassory violation only accrues to a person with a property interest in the home.[4] *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). ("Fourth Amendment rights are personal rights … which may not be vicariously asserted."); *see also United States v. Liu*, 2015 WL 163006, at *6-7 (E.D. Cal. Jan. 7, 2015) ("Even assuming [Defendant] has standing, she cites to nothing suggesting an overnight guest may rely on the "common-law trespassory test" expounded on in *Jardines*….").

---

on whether the entire breezeway constitutes curtilage, finding specifically that the area immediately outside Apartment 86's door, and its seam are curtilage, and thus constitutionally protected.

[4] Grant cites *United State v. Jones,* 132 S.Ct. 945, 949-950 (2012), wherein a Fourth Amendment violation was found when officers trespassed on a car registered to defendant's wife, for the proposition that a third party may assert a trespassory violation even when they do not own the property. However, in a footnote the Court explains that defendant was the "exclusive driver" and that "he had at least the property rights of a bailee." *Id*. at fn. 2.

Thus, Defendant is left with only his privacy interest in the house. The Court in the majority opinion[5] specifically declined to "decide whether the officers' investigation of Jardines' home violated his expectation of privacy. . . ." *Jardines* at 1417. And this lowly judge need not either, because even if the Defendant suffered a Fourth Amendment violation, the question of whether the exclusionary rule is appropriate in a particular context is a separate issue from the question of whether the Fourth Amendment has been violated by police conduct. *Arizona v. Evans,* 514 U.S. 1, 12-13 (1995). Thus, the fact that a Fourth Amendment violation has occurred does not necessarily mean that the exclusionary rule applies. *Herring v. United States*, 555 U.S. 135, 140 (2009)(citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983). The purpose of the exclusionary rule is not to redress the injury to the privacy of the Fourth Amendment victim, but to deter future unlawful police conduct, thereby effectuating the Fourth Amendment guarantee against unreasonable search and seizure. *United States v. Calandra*, 414 U.S. 338, 347-48 (1974).

Even if Defendant's Fourth Amendment rights were violated, exclusion is not appropriate here. The search that resulted in the discovery of the firearm with which Defendant is charged, was made pursuant to a search warrant. As the Eleventh Circuit outlined in *United States v. Martin,*

> *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. The *Leon* good faith exception applies in all but four limited sets of circumstances. *Id.* at 923, 104 S.Ct. 3405. The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo–Ji Sales, Inc. v. New*

---

[5] In a concurring opinion, three Justices stated the would "happily have decided [whether a violation of the Fourth Amendment had occurred] by looking to Jardines' privacy interest." *Jardines* at 1418.

> *York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).
>
> The *Leon* good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. 3405. The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in "objectively reasonable law enforcement activity" and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies. *Id.* at 919–20, 104 S.Ct. 3405.

297 F. 3d 1308, 1313 (11th Cir. 2002).

The Court finds that the *Leon* exception is applicable in this case. Specifically, the circumstances in which *Leon* should not apply are not present here. There is no evidence that the magistrate was misled by information contained in the affidavit, that the magistrate abandoned her role, that affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. The dog sniff evidence was presented as an additional factor in establishing the requisite probable cause for the issuance of the warrant.

In determining whether the *Leon* exception applies here, the Court has considered the Eleventh Circuit's decision in *United States v. McGough*, wherein the Court declined to extend the *Leon* exception to an unlawful entry into an apartment. 412 F.3d 1232 (11th Cir. 2005). In *McGough*, police officers responded to a 911 hang up call and found a little girl home alone. *Id*. at 1233. When the officer arrived, the child was locked behind a door with burglar bars. *Id*. at 1233-34. Before the fire department could release the girl, her father, McGough, arrived with a key to the apartment. McGough was arrested for reckless conduct and an aunt was called to care for the child. *Id*. While waiting for the aunt to arrive, the child was placed in a patrol car. *Id*.

8

After McGough was arrested, a police officer asked him if the police could go inside the apartment and look around. McGough denied consent to enter the apartment. *Id*. at 1234.

While waiting for the aunt to arrive, police officers noticed that the child was not wearing any shoes. *Id*. Because the child was too scared to go inside the apartment alone, an officer accompanied her into the apartment to get a pair of shoes. *Id*. While inside, the officer observed a firearm and what appeared to be marijuana in one of the bedrooms. *Id*. The officer called out to another officer to come into the apartment to see these items. *Id*. at 1234-35. After doing so, the assisting officer left in order to obtain a search warrant. *Id*. at 1235. The Eleventh Circuit declined to extend the *Leon* exception in *McGough*, holding

> In this case, it was not an "objectively reasonable law enforcement activity" but rather the officers' unlawful entry into McGough's apartment that led to [the officer's] request for a search warrant. In such a situation, "the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling."… Because the officers were not permitted to enter McGough's apartment under these circumstances, without a warrant and without his consent, we find the exclusionary rule is applicable. The evidence obtained as a result of the police officers unlawful entry into McGough's apartment should be suppressed.

*United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005). Years of binding precedent make clear that law enforcement's entry into a home without valid consent or a warrant, absent a few exceptional circumstances, is forbidden. The police officers in McGough would have been well aware of this and their warrantless search under the above described circumstances was not "objectively reasonable law enforcement activity."

The relevant inquiry here is whether the dog sniff conducted by police at the door of Apartment 86 was "objectively reasonable law enforcement activity." Here, the situation is more similar to that encountered in the Eighth Circuit's *United States v. Hopkins* decision. 824 F.3d 726 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 522 (2016). The *Hopkins* Court summarized the facts presented as follows:

> A Cedar Rapids police officer ordered his narcotics dog to sniff along the exterior walls of the building in which Donnell Hopkins rented a townhome. The dog alerted after sniffing within 6 to 8 inches of Hopkins' front door. Police applied for a search warrant which an Iowa magistrate issued. When the police executed the search warrant they found a gun and drugs on Hopkins' person and additional drugs inside the townhome.
>
> The district court denied Hopkins' motion to suppress the evidence after concluding that although the dog sniff was unconstitutional under *Florida v. Jardines*, ––– U.S. ––––, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), the officer had relied in good faith on the magistrate's probable cause determination and issuance of the warrant, *see United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

*United States v. Hopkins*, 824 F.3d 726, 729 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 522 (2016)(footnote identifying district judge omitted). Affirming the district court, the Eighth Circuit held:

> In order for the *Leon* good faith exception to apply to a warrant based on evidence obtained through a violation of the Fourth Amendment, "the detectives' prewarrant conduct must have been close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quotation omitted). Our inquiry is confined to "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405….Hopkins does not contend that Officer Fear made any misleading statements in his affidavit. Nor did the Iowa magistrate wholly abandon her judicial role. *See Leon*, 468 U.S. at 923, 104 S.Ct. 3405 (citing *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979)). The warrant application was not lacking in indicia of probable cause nor facially deficient due to a lack of a particularized description of the place to be searched. *See id.* Officer Fear's actions were "close enough to the line of validity" to make his belief in the warrant's validity objectively reasonable. *See Cannon*, 703 F.3d at 413. Officer Fear testified that he was aware of the Supreme Court's holding in *Jardines* but he thought that it did not apply to this search. He believed there was no individualized area outside the apartments and that Marco was on a "joint sidewalk" when he sniffed Hopkins' door. In his affidavit supporting the warrant application, Fear stated that the door was "an exterior door ... which leads to the outside common area." Since *Jardines* had concerned a single family residence and *Burston* was not yet decided, Officer Fear had an objectively reasonable belief that *Jardines* did not apply and that the dog sniff was legal….Officer Fear disclosed to the Iowa magistrate the legally relevant facts about the dog sniff. *See* 703 F.3d at 414. His affidavit stated that Marco sniffed an exterior door "which leads to the outside common area," and the area in the center of the courtyard

>away from the doors and windows of the individual units is common. It also disclosed that Marco had "sniffed the door bottoms," indicating that Marco had to be quite close to the doors. As we explained in *Cannon*, "[o]nce the state court judge considered these facts and issued the warrant, it was reasonable for the detectives to believe the warrant was valid." *Id.* Although we conclude that the dog sniff in this case violated *Jardines*, the legal error "rest[ed] with the issuing magistrate, not the police officer." *Id.* (quotation omitted). Because the *Leon* good faith exception to the exclusionary rule applies, the district court did not err in denying Hopkins' motion to suppress the evidence from the search of the apartment.

*Hopkins* at 733-34.

Though *Hopkins* is not binding on this Court, the reasoning is persuasive. There is a difference between the police conduct faced in *McGough*, which involved blatant misapplication of warrant requirement concepts well known to law enforcement, and the conduct faced here, which was a police officer's use of a drug detecting dog in an apartment breezeway and at the door of an apartment. The Court itself has had difficulty at answering the question presented, *i.e.*, whether under applicable Circuit and Supreme Court precedent, Defendant's Fourth Amendment rights were violated by the dog sniff at Apartment 86's door. The post-*Jardines* uncertainty in this area of the law lead this Court to find that the police officers did not engage in "objectively unreasonable conduct," like that encountered in *McGough*, by using the drug dog at the apartment door.

The search of the apartment was pursuant to a warrant. The affidavit offered in support of the search warrant application included the dog alert information (though not detailed as to exact location of sniff), as well information obtained from what was described as a reliable source. The source's information was somewhat corroborated by police observations of the defendant's car at the apartment. And then further corroborated by the dog alert to narcotics.

This Court is also persuaded by the Eleventh Circuit's guidance with regard to *Leon* and good faith:

11

> Our reading of *Leon* persuades us that the proper test is whether the *officer* acted in objective good faith under all the circumstances. The focus in *Leon* is on the officer. "[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable...." *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23. *See also Illinois v. Krull,* 480 U.S. 340, 355, 107 S.Ct. 1160, 1170, 94 L.Ed.2d 364 (1987) ("Nor can a law enforcement officer be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional."); *United States v. Cardall,* 773 F.2d 1128, 1133 (10th Cir.1985) ("the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers")… Thus, we subscribe to a standard which is focused on a reasonably well-trained officer and is based upon the totality of the circumstances. Our standard comports with the language used in *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23 ("whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization") ("all of the circumstances ... may be considered"), and is also consistent with the purposes underlying the exclusionary rule and the good faith exception, *id.* at 916, 919, 104 S.Ct. at 3417, 3418 ("the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates") (the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity").

*United States v. Taxacher*, 902 F.2d 867, 871-72 (11th Cir. 1990)(emphasis in original). Ultimately, though the Defendant's Fourth Amendment rights may have been violated, the Court does not find that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. Accordingly, the *Leon* exception is applicable and Defendant's motion to suppress is **DENIED**.

    **DONE** and **ORDERED** this **2**<sup>nd</sup> day of **June 2017.**

                      /s/ Kristi K. DuBose
                      **KRISTI K. DuBOSE**
                      **CHIEF UNITED STATES DISTRICT JUDGE**